UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JERRY LEE MOORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL NO. 1:12cv54 |
| | ) |
| TERRY WOLFE[1], | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant, Tari Wolfe ("Wolfe"), on March 1, 2013. The plaintiff, Jerry Lee Moore ("Moore"), proceeding pro se, filed his response and affidavit on May 28, 2013 to which Wolfe replied on June 1, 2013.

For the following reasons, the motion for summary judgment will be granted.

Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not every dispute between the parties precludes summary judgment, however, since "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" warrant a trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly

---

[1] The defendant is mis-named in the complaint. Her name is Tari Wolfe.

supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010).

## Discussion

Wolfe has provided the following factual summary. Moore was incarcerated at the Wells County Jail at all times relevant to his Complaint. Moore is now incarcerated in the Indiana Department of Corrections. Moore filed this action for alleged violations of his Eighth and Fourteenth Amendment rights under 42 U.S.C. §1983 against Wolfe. In his Complaint, Moore alleges that Wolfe, while employed as a nurse at the Jail, violated his Constitutional rights because she refused to give him his medication for his back, leg and neck problems on December 15, 2011. Moore further alleges that he did not see a doctor for blood in his urine or an ear infection.

Wolfe is a licensed practical nurse employed by Correctional Healthcare Companies. Correctional Healthcare Companies contracted with the Wells County Sheriff to provide medical services to the Wells County Jail. Wolfe was the nurse regularly assigned to the Wells County Jail. She testified in her affidavit that she was physically at the jail at least two times a week, but typically three days. When she was not there, a nurse, typically Tina Grist, LPN, was available by phone. A doctor visited the Wells County Jail twice per month, usually every two weeks. A doctor was also available by phone 24 hours a day, 7 days a week.

Moore was booked into the Wells County Jail on December 14, 2011. He reported to officers that he took Methadone and Hydrocodone for degenerative disc disease. Moore's family brought his medication to the jail, but it was believed that Moore was noncompliant with his

2

medications, because the number of pills left in the prescription bottles did not match the prescription date. Officers reported that Moore complained of not feeling well, so they called Tina Grist, LPN, the on-call nurse, who instructed them to give Moore Ibuprofen three times a day until the jail nurse, Wolfe, could see Moore. Despite his complaints of discomfort, Moore refused Ibuprofen. Moore also submitted an Inmate Grievance Form on his first day in the jail, stating that jail staff refused to give him his prescribed medication.

Wolfe examined Moore on December 19, 2011. Moore reported taking Methadone 10 mg. and Hydrocodone at home and that he needed pain medicine due to several bad discs in his back. Wolfe reviewed the medication bottles brought in by Moore's family. His prescription was from December 9, 2011 and she noted that Moore was not compliant with the medication according to the number of pills left compared to the prescription date and dosage. Wolfe called Dr. Cullinan, the on-call doctor, and he decided not to prescribe these narcotic pain medications for Moore. Instead, he prescribed Tylenol 1000 mg. twice a day for three days and Ibuprofen 600 mg. for three days for Moore's chronic pain and also instructed Moore to drink a lot of fluids.

Wolfe noted that Moore ambulated to the medical office without difficulty. Moore was able to flex and extend bilateral feet and legs. Wolfe's exam did not reveal any acute issues and Moore's vital signs were normal. She did note two small areas of redness on Moore's arms, but there was no active bleeding and no open areas. Moore complained of "toxic mold" in the jail showers which caused him to cough, although he admitted that he smoked prior to incarceration. Wolfe instructed Moore to push fluids and return as needed. She also gave him Tylenol and Ibuprofen, 200 mg. Moore signed an authorization for release of his records from Dr. Carl in Fort Wayne, where he treated in the past.

On December 20, 2011, correctional staff reported that Moore was complaining of rash/red spots on his arm. Wolfe responded that she was aware of the spots and advised she would see Moore on Wednesday. Moore was given his Tylenol and Ibuprofen. Wolfe examined Moore on December 21, 2011. Wolfe noted pink to red discolored areas on bilateral forearms irregular in size and shape, but no bleeding or drainage. Moore denied any injury. Wolfe took Moore's vital signs, which were normal. Wolfe called the on-call doctor, Dr. Cullinan, who ordered ice to forearms if it was helpful and Tylenol for discomfort. Wolfe told Moore to return as needed. On December 22, 2011, Moore was given Tylenol, but he refused his Ibuprofen.

On January 1, 2012, Moore requested an extra mat to sleep on because of his medical conditions. He also requested the narcotic pain medication that he came to the jail with. Wolfe responded to this request on January 4, 2012 and reminded Moore that, as they discussed on December 21, 2011, he would not get those medications in the jail and that the medical staff could not approve extra mats for discomfort. Moore again requested an additional mat on January 9, 2012. Wolfe advised Moore that she was still awaiting his records from Dr. Carl in Fort Wayne and when they received his prior medical records, the jail doctor would review them and make further suggestions if necessary. She also reminded him again that the medical staff could not approve an extra mat without records and a doctor's order. Moore reported back pain all the time, as well as chronic leg and neck pain. Moore's vital signs were all normal, but Wolfe referred Moore to the jail doctor for his complaints.

Moore submitted an Inmate Request Form on January 13, 2012 asking to see the doctor and for medical personnel to gather his medical records. Wolfe responded to this request and reminded Moore that his prior medical records had already been requested. Moore submitted an

Inmate Grievance on January 17, 2012 stating that he saw the nurse a week ago and she informed him he would see the doctor within two days and he had not seen the doctor yet. Wolfe responded to this grievance the next day and informed Moore that the doctor did not come to Wells County every week and that he was detained one week due to weather. She assured Moore that he was on the list to see the doctor. On January 20, 2012, the Wells County Jail received Moore's prior medical records from Dr. John Carl of Fort Wayne. The jail doctor, Dr. Kiana, examined Moore on January 26, 2012 and reviewed Wolfe's notes from her physical exam on January 9, 2012. Correctional officers noted that to and from the exam, Moore walked quickly and without any problems, but during the exam, he told the doctor everything hurt and that he could barely walk. Officers also noted that they escorted Mr. Moore back to his cell after his exam and he had no problems walking.

    Moore complained of blood in his urine for the first time on February 5, 2012 and asked to see the doctor. He claimed that the last jail doctor he saw could not address his problem at all. Wolfe responded to the request and informed Moore that while he was at the jail, the jail doctor was responsible for his care. Wolfe examined Moore on February 10, 2012 and she obtained a urine specimen, which was clear, and mostly normal. Moore's temperature was 98.5. Wolfe called Dr. Kiani and received a prescription order for Bactrim, an antibiotic, for 7 days for a possible urinary tract infection. She also advised Moore to increase his fluid intake and use Tylenol or Ibuprofen for discomfort. Wolfe rechecked Moore's urine on February 17, 2012, and it was mostly normal and had no blood.. Dr. Kiana continued Bactrim for 3 days and ordered Moore to push fluids. Moore submitted an Inmate Grievance on February 24, 2012 stating that he was on antibiotics for 10 days, but still had blood in his urine. He claimed that the nurse then

continued antibiotics and was supposed to recheck his urine, but she never did. Wolfe responded to Moore's grievance on February 27, 2012 and stated that he was seen for a fall during court and his urine was checked at that time and the blood portion of the test was negative. Moore was examined by Wolfe on February 27, 2012. He reported that he just fell on his knee but he was not hurt. He also complained that his urine was still bothering him. Moore's knee exam was normal and his urine was tested and all of the values were normal except for Leukocytes. There was no blood in Moore's urine according to the test. Moore complained of frequent urination, especially at night. The jail doctor ordered Ibuprofen 200 mg. 3 tabs twice daily for 3 days, Hytrin (for frequent urination) and Cipro, an antibiotic, for 7 days. *Id*.

Moore submitted Inmate Request Forms on March 1 and 2, 2012 asking about the medications he was recently prescribed. Wolfe met with Moore on March 2, 2012 and informed him that he was prescribed antibiotics and Hytrin for mild BPH, which is benign prostatic hyperplasia, which could be causing his frequent urination. Also on March 2, 2012, someone dropped off Ibuprofen 200mg. tablets for Moore. On March 3, 3012, Moore signed an authorization allowing the jail staff to speak with the ACLU about his medical condition. On March 7, 2012, the jail had the showers in G-block, where Moore was housed, tested due to Moore's complains of "toxic mold." The rest results showed Cladosporium and Penicillium and early-stage mold growth.

Moore complained of an earache on March 13, 2012 and asked to see the nurse. He also wanted his urine checked for blood. Wolfe examined him the next day and his left inner ear canal was slightly swollen, but there was no bleeding or drainage and she could not visualize his ear drum. His right ear was less swollen, with no bleeding or drainage. Neither of Moore's ears

6

were red. Wolfe told Moore to use ear wax remover for three days, per the doctor's orders. Moore complained of infection in both ears and that he could not hear. Moore's throat was normal and his temperature was 98.1. Wolfe checked Moore's urine, which was negative for blood. She advised him that a sterile catheter specimen could be sent for urinalysis, but Moore declined. He denied discomfort at this time.

   Wolfe examined Moore again on March 16, 2012. On March 19, 2012, the ACLU sent a letter to the Sheriff about complaints Moore had made about his medical care. On March 20, 2012, Moore submitted an Inmate Request Form that the ear drops were making his ears worse and he wanted to use the antibiotics he had from a couple weeks ago. Moore returned to see Wolfe on March 22, 2012.  Moore complained that his ears were still painful and red and that he could not hear clearly. On exam, his ear canal was red and swollen. His temperature was 98 and his mouth and throat were normal and his lungs were clear. Wolfe obtained a prescription for Amoxicillin from the jail doctor for possible ear infection.

   On April 2, 2012, Wolfe spoke with Kandy Kendall from the ACLU regarding  Moore's complaints. Wolfe advised her that Moore first notified medical personnel of blood in his urine on February 5, 2012 and he was seen in the office and treatment was initiated on February 10, 2012. She also advised her that follow up urine checks had been completed and that Moore declined to be catheterized for a urinalysis.

   Moore submitted an Inmate Grievance on April 9, 2012 that he asked to see the nurse two weeks ago and that he had not seen her yet. Moore claimed to have an infection in both ears, both eyes, and blood in urine, as well as breathing problems from toxic mold in the showers. Wolfe responded to this grievance the same day and reminded Moore that he was seen by

medical staff on 12/19/11; 1/9/12; 2/10/12; 2/17/12; 3/2/12; 3/14/12/ 3/22/12 and 4/2/12 and that he was treated for possible infection in both ears. She also told Moore that this was the first complaint he had made about eye problems. She advised him that the showers had been tested and that there was no toxic mold. She informed him that she would add him to the list of inmates to see the doctor at his next visit.

 Moore complained that he still had blood in his urine on April 11, 2012. However, he would not agree to catheterization because he claimed the room was not sterile. Wolfe also started the process of scheduling Moore for a urology consultation and was awaiting a return call. Wolfe heard back from the Caylor-Nickel Clinic that day and Moore was scheduled for an appointment on April 27, 2012. On April 27, 2012, Moore had a urology consultation at the Caylor-Nickel Clinic for his repeated complaints of blood in the urine. Moore reported a history of blood in his urine and semen to the urologist.. A urine culture was done and the urologist recommended a cytoscopy to rule out recurrent infection.. The urologist, Dr. Stogdill noted that Moore previously had hematuria (blood in the urine) in 2010 and had a urology workup with CT scan showing normal kidneys and 3.6 abdominal aortic aneurysm. He was scheduled for a cytoscopy in the past but never showed up or followed up.

 On April 30, 2012, the jail received a call from Dr. Stogdill, the urologist, regarding Mr. Moore's negative urinalysis results. The results showed no growth and no bacteria. The urologist recommended a cytoscopy within a year and to continue the current plan of care. The Sheriff also received a letter from Kandy Kendall of the ACLU. According to the ACLU, Moore recently told them that his ear infection was still present because he could not hear and he had a headache constantly. The ACLU asked the Sheriff to review his medical file and resolve his

issues. On May 16, 2012, Wolfe spoke with Kandy Kendall from the ACLU regarding Moore's appointment with the urologist and follow up plan of care.

On June 13, 2012, correctional officers reported that Moore had chest pain, shortness of breath, and pain in his arm. They advised Wolfe, who asked to see Moore immediately.  Officers brought Moore to the medical area in a rolling chair. Wolfe took Moore's blood pressure and blood sugar, which were normal. He reported stabbing pain from tightness, which he could also feel in his back.  He was alert and oriented. He was cooperative; slightly wheezing, noted with exertion; skin was pale and he was diaphoretic.  He could not take a deep breath due to chest discomfort.  His heart rate was strong and very rapid. Moore denied a spicy supper and activity on the block. Wolfe decided to send Moore to Bluffton Regional Medical Center for evaluation and treatment.

At Bluffton Regional Medical Center, Moore had a urinalysis, which was normal, except for trace amounts of blood.  Moore was diagnosed with coronary artery disease and a fast heart rate. The hospital staff noted that his medical history was significant for osteoarthritis, chronic back pain and COPD. Moore had a cardiology consultation the next day at the hospital.  At first he denied prior cardiac symptoms but then readily admitted to extensive cardiovascular problems, including multi-vessel coronary artery disease. He also had stents placed for right coronary stenosis in May, 2007, as well as stents placed for 100% occlusion of the left common iliac and a stent for 99% stenosis of the right superficial femoral artery in the past. Upon review of the chart, the cardiologist saw that in 2008, the same facility recommended medication including beta blockers, but Moore did not take any of these and said "my heart is fine." The cardiologist recommended that he start on Metoprolol and continue aspirin three 25mg daily. He

noted that Moore was at a high risk for recurrence of a fast heart beat and/or progression of coronary artery disease. Moore was discharged from Bluffton Regional Medical Center on June 14, 2012 and his chest pain was resolved. Moore was discharged with prescriptions for Metoprolol, 25 mg., Ibuprofen, Terazozin (for bladder problems), ASA, and a multi-vitamin. He was told to follow up with the jail doctor in one week, do activity as tolerated, and a regular diet. His diagnosis was coronary artery disease.

When Moore returned to the jail, he was placed in an observation cell for medical reasons. On June 15, 2012, Moore refused his medication, stating that he was fine. Wolfe reviewed his diagnosis from the hospital and communicated his new prescriptions to Dr. Kiana, who prescribed the Metoprolol 25 mg. twice daily, ASA three 25 mg. daily and a multi-vitamin, daily. When Moore was in medical observation, he was agitated and demanding with staff. He thought staff was keeping him in observation as punishment. Wolfe attempted to explain to Moore that it was routine to closely monitor a patient for several days following a cardiac event. Wolfe took Moore's vital signs and Moore abruptly exited the office stating "I'm done, I don't need to hear anything else." On June 18, 2012, Moore asked to be released from observation because he was okay. On exam, he was alert and oriented and able to answer questions. His color was good and extremities were warm to touch. He denied any pain or discomfort. His dietary intake and fluid intake were good and his respirations were regular and easy. His heart rate was strong at 72 beats a minute and his respiratory rate was 20. Moore was released to general population, per doctor's orders. Moore also signed an authorization for release of his medical records from Bluffton Regional Medical Center and those records were requested.

On June 28, 2012, jail staff received Mr. Moore's medical records from Bluffton

Regional Medical Center for the doctor to review. Moore submitted an Inmate Request Form on July 1, 2012 asking why he had not been set up with the cytoscopy that the urologist suggested. Wolfe responded on July 4, 2012 that his follow-up appointment had been scheduled, but per jail policy, she could not tell him the date and time of the appointment for security reasons. Moore's follow-up appointment with the urologist was scheduled for January 11, 2013. Moore submitted an Inmate Request Form on July 5, 2012 asking to know when he was going back to see the urologist. Wolfe responded that he should see her response from the previous day.

On July 18, 2012, Wolfe examined Moore and performed a full physical exam. Moore reported feeling good, but had a recent bug bite. Moore's vital signs were all normal. Wolfe advised Moore to continue following the doctor's previous orders and watch his sodium intake. Moore was examined by the jail doctor on July 21, 2012. Moore complained of pain. The doctor noted that Moore was doing well with no coughing or shortness of breath. He continued Metoprolol and ASA and prescribed an eye drop. Moore submitted an Inmate Request Form on July 25, 2012 stating that he had another ear infection from the water and that this was a recurring problem since March of 2012. Dr. Kiani saw him the next day for that complaint. Moore transferred to the Indiana Department of Corrections on August 20, 2012. After that transfer, Wolfe was no longer involved with Moore's medical care.

In support of her summary judgment motion, Wolfe contends that the medical care that she provided to Moore was reasonable, appropriate, and within the applicable standard of nursing care. Wolfe states that as a licensed practical nurse, she does not prescribe medications and therefore did not prescribe or discontinue any of Moore's medications. Wolfe assessed Moore and carried out the doctor's orders for medication, but she did not make any decisions

11

regarding what medications Moore should take. Her job as the Wells County Jail nurse was to assess inmates' medical needs, schedule them to see the doctor when necessary, coordinate medical appointments for them outside of the jail when necessary, and to dispense medication and treatment consistent with the doctor's orders. Wolfe argues that no reasonable jury could find that she was deliberately indifferent to Moore's medical needs.

Moore alleges that Wolfe violated the Eight Amendment's prohibition against cruel and unusual punishment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, by acting with deliberate indifference to his serious medical needs. The Supreme Court has interpreted the Eighth Amendment's proscription against cruel and unusual punishment as imposing a duty upon the States, through the Fourteenth amendment, to provide adequate medical care to incarcerated individuals. *Boyce v. Moore*, 314 F.3d 884, 888-889 (7th Cir. 2002), citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). A prisoner is not entitled to unqualified access to healthcare. *Boyce v. Moore*, 314 F.3d at 888-889. In addition, a prisoner cannot demand specific care and is not entitled to the best possible care. *Johnson v. Doughty*, 433 F.3d. 1001, 1013 (7th Cir. 2006); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999).

Prison officials violate an inmate's Eighth Amendment rights if they act with "deliberate indifference" to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291 (1976). The Supreme Court observed in *Estelle v. Gamble*, 97 S. Ct. at 292, that:

> In order to state a cognizable claim a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

To establish deliberate indifference, a plaintiff must prove two elements, one objective and one subjective. The plaintiff has the burden of demonstrating that "(1) the harm to the plaintiff was

objectively serious; and (2) the official was deliberately indifferent to his health or safety." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005); *Farmer v. Brennan*, 114 S. Ct. 1970 (1994).

An objectively serious medical need is one that has been diagnosed by a physician and that requires medical treatment, or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007); *Pinkston v. Madry*, 440 F.3d 879 (7th Cir. 2006); *Foelker v. Outagamie County*, 394 F.3d 510, 512 (7th Cir. 2005); *Jackson v. Illinois Medi-Car, Inc.* 300 F.3d 760, 765 (7th Cir. 2002); *Davis v. Jones*, 936 F.2d 971, 972-73 (7th Cir. 1991). Objectively serious medical needs rise to the level of injuries which are life-threatening, or pose a risk of needless pain or lingering disability if not treated immediately. *Pinkston v. Madry,* 440 F.3d. at 892; *Davis v. Jones*, 936 F.2d., at 972.

"Deliberate indifference" means recklessness in a criminal subjective sense, such as disregarding a risk of danger so great that knowledge of the danger can be inferred. *James v. Milwaukee County*, 956 F.2d 696, 700 (7th Cir. 1992). To be deliberately indifferent, the defendant must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Pinkston v. Madry*, 440 F.3d at 879; *Farmer v. Brennan*, 511 U.S. at 837. Deliberate indifference only occurs if the defendant knows of and disregards an excessive risk to inmate health or safety. *Greeno v. Dailey*, 414 F.3d 645, 654 (7th Cir. 2005); *Estate of Cole v. Fromm*, 94 F.3d at 258-259. Deliberate indifference must be a conscious disregard of known or obvious dangers. *Board v. Farnham*, 394 F.3d at 394.

To be deliberately indifferent, defendants must act with a sufficiently culpable state of mind. *Farmer v. Brennan*, 114 S. Ct. at 1981; *Steading v. Thompson*, 941 F.2d 498, 500 (7th Cir. 1991), *cert. denied*, 112 S. Ct. 1206 (1992). A culpable state of mind, or subjective intent, may be established by showing that the defendant had actual knowledge of impending harm that was

13

easily preventable, such that conscious refusal to prevent the harm can be inferred from the defendant's failure to prevent it or showing that a defendant deliberately avoided acquiring knowledge of impending harm. *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992); *Patrick v. Staples*, 780 F. Supp. 1528 (N.D. Ind. 1991). Deliberate indifference is a synonym for intentional or reckless conduct; reckless conduct so dangerous that the deliberate nature of the defendant's action can be inferred. *Foelker v. Outagamie County*, 394 F.3d, at 513. The defendant must know of the serious risk to the prisoner's health, *i.e.* the serious medical need at issue, and they must also consciously disregard that risk/need so as to inflict cruel and unusual punishment upon the prisoner. *Farmer v. Brennan*, 511 U.S. at 837-838. To be deliberately indifferent, the defendant must act with reckless disregard toward the inmate's serious need by inaction or woefully inadequate action. *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999). The defendant must have known that the prisoner was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so. *Board v. Farnham*, 394 F.3d at 478. Deliberate indifference is "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm. *Duane v. Lane*, 959 F. 2d 673, 677 (7th Cir. 1992). This total disregard for a prisoner's safety is the "functional equivalent of wanting harm to come to the prisoner." *McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991).

Medical malpractice, negligence, or even gross negligence do not constitute deliberate indifference, nor does dissatisfaction or disagreement with a doctor's course of treatment. *Johnson v. Doughty*, 433 F.3d. at 1013; *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002); *Dunnigan v. Winnebago County*, 165 F.3d 587, 592 (7th Cir. 1999); *Goka v. Bobbit*, 862 F.2d

14

646, 650 (7th Cir. 1988). Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference. *Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996).

Wolfe is not a medical provider and cannot and does not prescribe or discontinue patients' medication. When Moore entered the Wells County Jail, he had prescriptions for Methadone and Hydrocodone. Wolfe communicated these prescriptions to the jail doctor and the jail doctor made the decision not to prescribe the medication and instead to prescribe non-narcotic pain medication. As the nurse, Wolfe cannot override or change the doctor's orders, but she has to follow them. Moore wants to hold Wolfe responsible for not giving him his narcotic pain medication, but she did not have the power or ability to give him those medications without an order from the jail doctor. Thus, Wolfe maintains that she cannot be found to be deliberately indifferent for failing to do something that was not within her power or authority to do.

Each time Moore presented with a complaint, whether it be chest pain, ear pain, toxic mold in the showers, or blood in his urine, Wolfe took Moore's complaints seriously and examined him. She communicated the information she received from Moore and her examinations of him to the doctor, received orders from the doctor, then followed those orders. On two occasions, Wolfe even arranged for Moore to be seen by specialists outside the jail. Wolfe coordinated those appointments and then followed the recommendations of those providers once Moore returned to the jail.

Wolfe contends that her actions show that she was not indifferent to Moore, but that she considered Moore's medical condition, took his complains seriously, communicated Moore's medical needs to the doctor, and followed the doctor's orders. The 8th Amendment does not

entitle Moore to demand specific care in the form of Methadone and Hydrocodone and the fact that he disagrees with the medical care he received does not establish deliberate indifference. *Johnson v. Doughty*, 433 F.3d. 1001, 1013 (7th Cir. 2006); *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999); *Dunnigan v. Winnebago County*, 165 F.3d 587, 592 (7th Cir. 1999); *Goka v. Bobbit*, 862 F.2d 646, 650 (7th Cir. 1988).

In response to Wolfe's motion for summary judgment, Moore has submitted an affidavit in which he attempts to create issues of fact. However, as Wolfe notes, the majority of Moore's affidavit is inadmissible and will be stricken. Specifically, Paragraphs 5-13 contain inadmissible statements regarding Moore's "beliefs". Beliefs are not evidence and thus these statements will be stricken. Paragraphs 18 and 19 of Moore's affidavit will be stricken because they consist of rhetorical questions that are a reiteration of the allegations in Moore's complaint and are not admissible evidence. Paragraph 20 of Moore's affidavit contains inadmissible testimony from Moore as the testimony is not supported by any facts that would show personal knowledge by Moore of the events he testifies about.

In Paragraph 21 of Moore's affidavit, he states that it is untrue that Wolfe called the doctor who prescribed Amoxicillin for possible ear infection. Moore claims this is untrue because he is allergic to Amoxicillin. However, whether Moore is allergic to Amoxicillin has no bearing on the fact that Wolfe called the doctor, and does not create a material issue of fact.

Likewise in Paragraph 14 of Moore's affidavit he attempts to create a disputed fact about whether he was in pain and had trouble walking to and from the exam area. However, this is not a material issue of fact, as the issue is whether Wolfe treated him and the only admissible

evidence in the record shows that she continued to exam and treat Moore regardless of whether he was in pain or had trouble walking.

In Paragraph 15 of Moore's affidavit, Moore claims that medical staff was not available 24 hours a day, seven days a week, as set forth in Wolfe's affidavit. Clearly, Moore does not have personal knowledge of the working hours and availability of the jail's medical staff. In any event, Moore acknowledges that the officers at the jail called Wolfe on the phone and spoke to her about his medical condition, which fully supports Wolfe's testimony that medical staff was available by phone when they were not physically at the jail.

In summary, while Moore's affidavit shows that he disagrees with Wolfe about the severity of some of his symptoms, he has not created any dispute of material fact regarding the treatment he received from Wolfe.

Accordingly, as the admissible evidence in this case clearly shows that Moore received adequate medical care while at the Wells County Jail, and that Wolfe was not responsible for prescribing or discontinuing any of Moore's medication, summary judgment will be entered in Wolfe's favor.

## Conclusion

On the basis of the foregoing, Wolfe's motion for summary judgment [DE 51] is hereby

GRANTED.

Entered: June 21, 2013.

                                                                           s/ William C. Lee  
                                                                           William C. Lee, Judge  
                                                                           United States District Court